ANGEL *v.* GRAND RAPIDS & INDIANA RAILWAY CO.

RAILROADS—CROSSING ACCIDENT—EVIDENCE—SUFFICIENCY.

In an action by a pedestrian against a railroad for damages for personal injuries sustained as the result of being struck by one of defendant's trains at a crossing while his foot was caught between a rail and a plank outside the rail, evidence *held,* to warrant a verdict for plaintiff. FELLOWS and BROOKE, JJ., dissenting.

Error to Kent; McDonald, J. Submitted April 17, 1917. (Docket No. 61.) Decided September 27, 1917. Rehearing denied December 28, 1917.

Case by Byron Angel against the Grand Rapids & Indiana Railway Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*James H. Campbell* (*Elvert M. Davis,* of counsel), for appellant.

*Lombard, Hext & Washburn,* for appellee.

BROOKE, J. (*dissenting in part*). The plaintiff, a young man 25 years of age, had been employed as a locomotive fireman by the Michigan Central Railroad from the year 1911 until May 14, 1914, when he received the injuries which constitute the basis of his claim against the defendant company. It is his claim that his child died on that day at about 6 o'clock in the afternoon, and was to have been buried two days later, on the 16th of May. He testified that in the evening he secured a burial permit from the Catholic Church, and did not reach his home until after 9 o'clock at night, and that about two hours later he, in company with his brother-in-law, Frank Charkowske, went out to find the sexton in order to make arrangements for the preparation of the child's grave. Arriving at the sexton's house, a considerable distance from plaintiff's home, they found him absent, but claimed to have been told by a passing stranger that the sexton was visiting a friend or relative near the Standard Paper Mills at "the third or fourth house on Patterson street west of the railroad tracks." Plaintiff testified that they knocked upon the door of the indicated house, but that nobody came. After some delay plaintiff testified that they started back home, walking on the north side of Patterson street. This street crosses at right angles the defendant railway tracks. While crossing the main track plaintiff claims to have had his right foot caught between the rail and the planking adjacent thereto and to have been held in that position until a passenger train struck him, causing the injuries for which this action is brought. His testimony upon direct examination with reference to the manner of the happening of the accident is in part as follows:

"*A.* Well, I got part way across—when I got part way across the track, why, between one of the tracks and the rail, why, my foot slipped in there.
"*Q.* Which foot?

"*A.* My right foot. And I could not get it out. When I pulled up on it, it was kind of wedged, and I could not get it out. When I pulled up on it, it was kind of wedged, and I could not get it out, and I went to untie my shoe, and I pulled the string the wrong way, and I tied it in a hard knot, and down so far down in there, in the hole there, that I couldn't pull my foot out, or no way to get it loose; in fact, I didn't have no knife, anyhow, and I don't know whether my brother-in-law had a knife or not; if he did, he didn't seem to get it out to cut anything, and we tried a while, and along came a man by the name of Olin, and he tried to help us to get the foot out. I did not know Olin at the time, and the train was coming and they couldn't get it out, so they just ran up the track a ways and hollered and swung their hats. I saw them do that. I saw them when they went. When they went up the track I was left alone. I was still trying to get out. I have seen the arrangement of the plank and track since that time, so that I could recognize it.

"*Q.* Why couldn't you get your foot out, what was the trouble?

"*A.* Well, one side of the bottom of the rail catched on my sole on one side, and the planking on the other and held it fast in there, and I couldn't get it out, and it was so far in I had no room to wiggle my foot like that, from the top of the rail to the bottom. * * * Taking this photograph, I can point out how I got caught. I was going east on this sidewalk here, and crossed over the plank that appears in between the rails and the point of the toe of my shoe—the hollow of my foot was right across that hole, or the ball, whatever you call it, and the heel was on the plank here, and as I went to step, like that, my toes were just on the edge of the rail, like that, and when the heft of my body was on my foot it slipped down in there, like that, kind of sideways, and I kind of lost my balance a little, and when I went to pull my foot out it was fastened down in there so's I couldn't get it out. I do not know anything about the thickness of the planking. I should think the rail was about seven inches high from the base to the top. The base of the rail, as I always called it, is the bottom of it, the bottom where it rests on the tie. * * *

"*Q.* I want you to tell it yourself just what happened to you when your foot went down in there.

"*A.* Well, when my foot went down in there, why, I gave kind of a quick jerk after I straightened up and tried to wiggle it like that (illustrating), and I couldn't wiggle it out, neither, and then I tried to unstring my shoe, and tied it in a knot, and I couldn't get it out.

"*Q.* Now, what I want to get at, Mr. Angel, if you can tell, you know as to whether the sole of your foot, shoe, went below the rail; I mean the base of the rail, and I mean the rail of the track, did your shoe go below that?

"*A.* It did.

"*Q.* And do you know whether you went below the lower edge of the planking?

"*A.* I did.

"*Q.* Then why couldn't you get your foot out?

"*A.* Because it wedged; the planking on one side of the sole and the rail on the other, couldn't pull it out. When I found my foot was wedged in that way I tried to jerk it out. My brother-in-law, Frank, was with me at the time. Someone else came along while I was in that condition. His name was Olin. I think the weather was good, but on that side of the street it was dark, but on the other side of the street it was quite light. At that time the leaves on some of the trees kept the light from shining down there from where the street light was located. It must have been the leaves that came out in the spring. There was quite a bunch of brush along there, I know.

"*Q.* When you found that your foot was caught, what effort did you make to get it out? You have told us part of that, but I want you to give us in detail now, if you will.

"*A.* Well, I tried to pull it out, and I tied it in a knot, and my brother-in-law, he tried to help get it out, and he couldn't, and they both took hold of my leg and tried to pull it out.

"*Q.* Who do you mean by 'both'?

"*A.* This man Olin came along. They couldn't get it out, and the train was coming, and they said, 'There comes the train; can't get it out; better go and see if we can't stop it'; and they started up the track on a run. I saw them go up the track. I didn't watch

them after they went up the track. They went quite a ways. I was trying to get my foot out all of the time. I don't believe the train stopped.

"*Q.* What happened? Just go on, tell the jury in your own way what happened to you.

"*A.* Well, the train come—

"*Q.* So far as you know.

"*A.* So far as I know, the train come along, and when it got close to me, that is the last I know about it.

"*Q.* Did you see the train coming yourself?

"*A.* I did.

"*Q.* When you saw it coming, what did you do to protect yourself?

"*A.* I tried to do as every switchman does when they try to protect themselves.

"*Q.* Louder; the jury can't hear that.

"*A.* I say I tried to do as the switchmen do to protect themselves; they lean back and try to get their foot up to the footboard and protect themselves. You couldn't protect very much.

"*Q.* You mean by that getting your body off the rail?

"*A.* Yes, sir.

"*Q.* Just tell the jury what happened when the train struck you.

"*A.* It struck me and knocked me across on the other side of the sidewalk, jerked my foot out of there, knocked me across on the other side of the street, pretty near to the other crosswalk.

"*Q.* Did the train stop?

"*A.* I didn't see no train after that. It could not have stopped. I didn't see them stop.

"*Q.* After you were struck what was the next thing that happened, so far as you know? I am speaking now what you can recollect yourself.

"*A.* My brother-in-law came over to me and kind of took hold of my arm and helped me up, and he asked me if l was hurt. I told him no. And then he asked me if I wanted a hack.

"*Q.* Speak up louder.

"*A.* He asked me if I wanted a hack to go home. I told him no. And he says, 'Are you hurt?' I says, 'I guess not.' And I got up, and this man Olin says,

'Do you think you can manage him all right?' My brother-in-law says, 'Yes.'

"*Q.* Speak up loud so we can all hear you.

"*A.* He says, 'Yes; I guess I can.' So he went away. That was the last I seen of him.

"*Q.* That is, this man Olin went away?

"*A.* Yes.

"*Q.* And he left you with your brother-in-law?

"*A.* Yes.

"*Q.* Then you stated at that time that you didn't think you were hurt?

"*A.* No, I didn't feel hurt at all, felt kind of numb; I couldn't even feel my feet when they touched the ground.

"*Q.* What did you do after that?

"*A.* Went home, I guess."

He further testified that he reached home with the aid of his brother-in-law and that a doctor was immediately called to give him attention. Another doctor, Dr. Lang, saw him on the morning after the accident, and ordered his removal to a hospital, where he remained for four days. Dr. Lang testified as follows:

"I found his condition at that time to be a lacerated large toe, and, I think, a fracture of the bone, I have forgotten particularly but the toe.

"*Q.* Do you recall now, do you remember, how many bones were involved in the injury?

"*A.* I think there were at least two; I have forgotten; the second toe, the toe next to the large toe, I believe, was also bruised, split, some injury, and probably the third one as well was injured.

"*Q.* State it in your own way, Doctor, what you found.

"*A.* It has been a long time ago since it has been brought to my mind. It seems to me he had bruises about his head and body, but I could not say definitely any more; I remember one particularly, bruise on the back of his head.

"*Q.* Will you point out where that was, Doctor?

"*A.* I think it was back in the occipital.

"*Q.* On which side was it on, do you recall now?

"*A.* I couldn't say.

"*Q.* Describe that bruise as best you can, as you now recall it, Doctor.

"*A.* There might have been a rupture of the scalp, but I am not sure of that; at any rate I remember of examining the head and cleansing it, recleansing it, rather, the doctor before me had done so, and that there was some swelling in the back of the head."

And on cross-examination:

"*Q.* Excepting the injuries to the toes on the right foot and the lump on the back of the head, did you find any injuries, cuts, bruises, or otherwise on any part of the body or the legs or arms?

"*A.* Not that I can recall now.

"*Q.* State whether or not you treated him for any such injuries.

"*A.* Not that I remember.

"*Q.* To the chest or to the body?

"*A.* No injury that I remember of."

After his release from the hospital plaintiff claims to have become subject to "seizures" of an epileptic character, whether true epilepsy or due to neurosis or hysteria the record fails definitely to disclose. He suffered from such a "seizure" during the progress of the trial in the court below, and was taken to an adjoining room for treatment.

On May 16th, two days after the accident, plaintiff, who held a policy in the Standard Accident Insurance Company of Detroit, furnished that company with the following claim:

"Standard Accident Insurance Company of Detroit, Michigan.   Notice of Accident.   1. Name of insured, Byron Angel.   Residence, 106 Lincoln Court, Kalamazoo, Mich.   Occupation when injured, locomotive fireman.   *   *   *   What date were you injured?   May 14, eleven p. m.   At what place?   Kalamazoo.   Who saw the accident?   Myself.   How were you hurt and what are your injuries?   Toes crushed and hurt in the chest.   What marks appear on external surface of your body?   A bruise on my left side.

[Signed] "BYRON ANGEL.

"Dated Kalamazoo, 16th of May, 1914."

Another claim was made on May 25, 1914, in which the following appears:

"The Standard Accident Insurance Company of Detroit, Mich. Notice of Accident. 1. Name of injured? Byron Angel. * * * 12. What date were you injured? May 14th, 2 a. m. At what place? Kalamazoo. 13. Who saw the accident? No one."

A third claim was made on May 26, 1914, the substance of which is as follows:

"1. My name is Byron Angel. 2. My age is twenty-five years. 3. My weight is 150 pounds. My height is 5 feet and 11 inches. My regular occupation, locomotive fireman."

And some other personal matters, and going right down to question 10:

"10. The eyewitnesses to said accident were S. Webster."

Stanley J. Webster, the man mentioned in the last above mentioned claim as having witnessed the accident, was called by the defendant and testified as follows:

"He passed the day and called me out and asked me if I wanted to make $100, and I said 'Yes,' and he said, 'Well I told my lawyers that you saw the accident; I want you to testify that you saw it.' I said, 'I won't do it.' I told him that because I didn't see it. I knew nothing of it. He went away then. I next saw him on Burdick street, Kalamazoo, a week or ten days after his visit to me at my sister's. He stopped me and said, 'I told my lawyers it was you; now, I want you to swear or say that it was you that saw it.' I said, 'I did not see it and I won't say it,' and he went on."

The record contains the evidence of at least ten persons who testified that the plaintiff told them severally that he was alone at the time of the happening of the accident and that he partly walked and partly crawled

home from the place of the accident. Many of these witnesses are clearly disinterested, and received their information from the plaintiff shortly after the happening of the accident, some of them having talked with him on the following morning.

Defendant placed upon the stand five reputable and disinterested physicians who testified as experts that, in their opinion, if the plaintiff had been held with his right foot between the inside of the rail and the planking until struck by an engine weighing 140,000 pounds, drawing a train of four passenger coaches, and running at a speed of 12 or 15 miles per hour, it was physically impossible that he should have received injuries of so slight a character as shown by the objective evidence in this case.

Many photographs of the place of the accident were introduced in evidence and have been returned to this court. The exact condition of the point in question seems to be, as shown by the exhibits, that the easterly · plank of the walk, which was 5 feet wide, was distant from the east rail of the main track 3 inches, and that this 3-inch space was $3\frac{1}{4}$ inches deep.

Defendant introduced expert testimony tending to show that the sidewalk at the point of injury was constructed in the usual manner and in accordance with good railroading practice, and that it was reasonably safe for use by one exercising ordinary care. Defendant likewise called as a witness one Gordon Stewart, a practicing attorney of the city of Kalamazoo, who was retained by the plaintiff on the morning of May 15th, immediately after the accident. Stewart testified that plaintiff related to him the circumstances surrounding the happening of the accident on the morning he was retained, and that thereafter, and on the same day, he proceeded to Patterson street and examined the crossing with particular reference to the

point where the sidewalk crossed the east rail of the main track. He testified:

"*Q.* Do you recall specially that place there between that rail and the plank?

"*A.* Yes; I went over it pretty thoroughly.

"*Q.* I am calling attention to the north crosswalk and to the space there between the rail and the plank next to it, the east rail of the track.

"*A.* Yes; I recall the condition there.

"*Q.* State in what condition you found that opening between the rail, and as to whether it was filled up or not. * * *

"*A.* I found the crossing and the plank next to the rail in the ordinary condition as it was filled up with dirt, and there was no hole of any depth there, other than enough for the flange of the wheel.

"*Q.* That opening there, the whole length of it, was filled up, and especially between the ties?

"*A.* Yes, sir.

"*Q.* And whether or not it was fresh filling?

"*A.* No; it appeared to have been that way for some time.

"*Q.* And these spaces were at that time filled up?

"*A.* Yes, sir.

"*Q.* So that there was no hole left?

"*A.* No, sir.

"*Q.* State whether or not the bottoms of the flangeway—whether the way for the flange inside of the rail within the limits of that plank walk was covered by earth.

"*A.* It was. * * *

"*Q.* Was that true, Mr. Stewart, of the whole space from the north end to the south end of the walk?

"*A.* Yes; I went over it very carefully, and could not find any hole in there or place that looked like where a man's foot might have got in.

"*Q.* You found no place where a man's foot could get in?

"*A.* No, sir.

"*Q.* No place where it could?

"*A.* No; not at that time.

"*Q.* And that was the next morning?

"*A.* Yes, sir.

"*Q*. After the accident?

"*A*. Yes, sir."

Plaintiff's statement of the manner in which he received his injuries received some corroboration from his brother-in-law, Frank Charkowske, and the witness Olin. Both testified that they were with him after he got his foot caught and attempted to release him. They testified further that they had no knife with which to cut the shoe lace, and that they were unable to break it so as to release the foot, and that while engaged in their attempt to release plaintiff they observed the approach of the train; that thereupon they ran a considerable distance up the track waving their hands in an attempt to warn the on-coming train of plaintiff's unfortunate predicament. Neither one of these witnesses claimed to have actually seen the train strike plaintiff, but both testified that after the passage of the train they immediately returned to the point where plaintiff was caught, and found that he had been thrown a distance of about 50 feet, and that he was injured in the manner described.

At the conclusion of all of the evidence defendant preferred a number of requests to charge, several of them in effect amounting to requests for a directed verdict. These requests were denied, and the case went to the jury under instructions:

"(1) That plaintiff could not recover unless the jury found that the accident happened in the manner detailed by him.

"(2) That the defendant was guilty of negligence either: (*a*) In not maintaining the crosswalk in a condition reasonably safe for public travel; or (*b*) in the failure of the engineer or fireman to see and heed the efforts of Charkowske and Olin to stop the train.

"(3) That plaintiff must be found free from any negligence contributing to his injuries."

The jury returned a verdict in favor of the plaintiff for $8,000. Immediately thereafter a motion was

made for a new trial based upon the claim that the jury disregarded the instructions of the court and rendered a verdict against the great weight of the evidence. This motion the court denied, saying in part:

"It is difficult to understand how the accident could happen in the manner claimed by the plaintiff and his witnesses. Yet it is a matter of common experience of men that accidents do happen sometimes in unusual and unexplainable ways and with most singular results. Men have fallen from great heights, or have been hurled with great force for long distances, and escaped with slight injuries. It is quite probable that this common knowledge weighed against the opinion evidence and led the jurors to credit the testimony of the three men who claimed to be eyewitnesses. The credibility of these witnesses was for the jury, and in view of their positive testimony I am not able to say that the verdict was against the great weight of the evidence."

In this court defendant argues in support of three propositions:

"(1) That the court erred in refusing to direct a verdict for the defendant as requested in defendant's first request (first asignment of error).

"(2) That the court erred in submitting the case to the jury and therein in refusing to instruct them as requested by defendant in its fifth request and in the modification of the same as shown in the third and fourth assignments of error (Record, pp. 588, 589), and in the instructions set forth in the seventh assignment of error, thereby leaving the jury to find that plaintiff was struck by the engine drawing the train as he claimed that he was, in disregard of the undisputed and conclusive testimony of the surgeons that it was a physical impossibility that he could have been so injured.

"(3) That the court erred in overruling defendant's motion for a new trial and to set aside the verdict in favor of plaintiff on the ground that it was against the weight of the evidence and in disregard of the evidence."

1. We are of opinion that the court did not err in refusing a directed verdict. The positive testimony of the plaintiff supported in some measure by the testimony of Charkowske and Olin touching the manner of the happening of the accident raised a clear question of fact which could only be determined by a jury.

2. Defendant's fifth request to charge was as follows:

"You must decide this case upon the evidence given before you upon the trial, and not upon whimsical conjecture and speculation. The testimony of Drs. Young, Barth, Spencer, Du Bois, and Campbell that a man on a railroad track with his foot held fast down between the rail and plank could not be struck by the bumper beam, or step, or pilot band of the locomotive engine No. 27, drawing a passenger train of four cars and running at the speed of about 15 miles an hour, without receiving severe and serious visible physical injuries at the place of the impact by the engine against his person which would be apparent for some weeks and from which it would take weeks to recover, if he recovered at all.

"The testimony of these doctors is undisputed; no one has testified to the contrary.

"You must accept and give effect to the testimony of these doctors in deciding the question whether the plaintiff was struck by the engine as he claims that he was."

The first paragraph of this request was given by the court, but in lieu of the second and third paragraphs the court said:

"This testimony, if you find that it correctly states the physical possibilities, should be accepted by you; and if you do so accept it, it would be your duty to disregard the testimony of the plaintiff as to how he received his injury and render a verdict for the defendant, a verdict of no cause of action."

We are of opinion that the instruction as modified was correct.

3. It was and is the claim of defendant that plaintiff did not receive his injuries in the manner detailed by him, but that the entire case is tainted with gross fraud and perjury. In this connection defendant relies upon the case of *Baldwin* v. *Railway Co.*, 128 Mich. 417 (87 N. W. 380). In that case plaintiff claimed to have been injured through being jerked from the lower step of a passenger train while in the act of alighting. This court there said that the manner of the accident as described by the plaintiff was improbable; there having been introduced the evidence of five experienced men to the effect that it would be impossible to start that particular train with such a jerk as to throw the plaintiff in the manner claimed. In that case, as in this, there was no eyewitness who testified that the accident did not happen exactly as claimed by plaintiff. In argument much reliance is placed on the testimony of five physicians who swore to their belief in the physical impossibility of the plaintiff having received such injuries as he sustained in the manner he claimed to have received them. With reference to this testimony it would seem that the opinion of an expert physician would not be of much more value than that of an ordinary layman. Most adults of ordinary intelligence would, as the learned circuit judge said, find it "difficult to understand how the accident could happen in the manner claimed by the plaintiff and his witnesses," and it is presumed that defendant might easily have multiplied his five expert witnesses indefinitely upon this point.

The fact remains that plaintiff in some way received an injury on the night of the 14th of May, 1914, and that defendant is obviously unable to offer a jury any theory alternative to that of the plaintiff. Nevertheless we are of opinion that the judgment should be reversed upon the ground that the verdict is against the great weight of the evidence. We are moved to this course by the following considerations:

(1) The evidence of the plaintiff to the effect that he was held fast in the track and struck by an engine and train running at 12 to 15 miles an hour, the engine alone weighing 70 tons, receiving as a result thereof only the external injuries described, is so contrary to all human experience as to border upon the miraculous.

(2) The asserted inability of the plaintiff and his brother-in-law to break the shoe lace and so release plaintiff's foot.

(3) The fact that within a week after the happening of the accident plaintiff in his claim to the accident insurance company asserted that no one was present when the accident happened but himself.

(4) The fact that the lawyer retained by plaintiff made an examination of the place where plaintiff claimed to have received his injuries and testified that the space between the rail and the planking for the whole distance of the sidewalk was full of dirt.

After careful consideration and a perusal of this entire voluminous record, we conclude that the judgment should be reversed, and a new trial ordered, with costs to appellant.

FELLOWS, J., concurred with BROOKE, J.

OSTRANDER, J.  My brother BROOKE concludes that the court was bound to submit the case to a jury, and committed no error in doing so. I agree with him. He concludes that the weight of the evidence demands that a different verdict be returned. With this I do not agree. Answering the argument he makes, it may be said: (1) That the weight of the engine is unimportant, and that, if an automobile weighing two tons had released plaintiff, it would have been no less a miraculous deliverance; but the weight of the engine may have caused such a vibration of the rail as to release the foot, (2) if the shoe lace had been

broken, it does not follow that the foot would have been released, and there is nothing remarkable in the fact that one cannot in an emergency, break, or untie, a shoe lace; (3) there was no one immediately present when plaintiff was hurt, both the others having gone up the track to meet the on-coming train; (4) the examination made of the track by the lawyer is not conclusive.

Really the evidence for plaintiff made out a very good case for him, and is not opposed, overwhelmingly or otherwise, by evidence. To set aside the verdict is to assume knowledge, to question evidence of unusual physical phenomena, and to infer, when two inferences may be drawn, that the one drawn by the jury is wrong.

It is not *probable* that upon the same record a different jury will return a verdict for defendant.

KUHN, C. J., and STONE, BIRD, MOORE, and STEERE, JJ., concurred with OSTRANDER, J.